IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>              Respondent,<br><br>       v.<br><br>CHAYCE HANSON,<br><br>              Appellant.<br><br>In the Matter of the Personal Restraint of Chayce Hanson. | No. 80046-9-I<br>(consolidated with No. 82905-0-I)<br><br><br>ORDER DENYING MOTION FOR RECONSIDERATION, WITHDRAWING OPINION, AND SUBSTITUTING OPINION |

Appellant Chayce Hanson moved for reconsideration of the opinion filed on February 28, 2022. The panel considered the motion pursuant to RAP 12.4 and determined that the motion should be denied. Additionally, the panel determined that the opinion should be withdrawn and a substitute opinion filed. Now, therefore, it is hereby

ORDERED that the motion for reconsideration is denied; and it is further

ORDERED that the opinion filed on February 28, 2022, is withdrawn; and it is further

ORDERED that a substitute opinion shall be filed.

FOR THE COURT:

_____
Coburn, J.

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>              Respondent,<br><br>        v.<br><br>CHAYCE HANSON,<br><br>              Appellant.<br><br>In the Matter of the Personal Restraint<br>of Chayce Hanson. | No. 80046-9-I<br>(Consolidated with<br>No. 82905-0-I)<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

COBURN, J. — This review consolidates Chayce Hanson's personal restraint petition (PRP) and his direct appeal of his convictions for rape in the second degree, tampering with a witness, assault in the second degree with sexual motivation, felony hit and run, and vehicular assault. Through a combination of his direct appeal, PRP, and statement of additional grounds, Hanson claims (1) the State violated equal protection by charging him with assault in the second degree with intent to commit indecent liberties rather than indecent liberties, (2) sufficient evidence did not support the vehicular assault and felony hit and run convictions, (3) ineffective assistance of counsel, (4) prosecutorial misconduct, and (5) the accumulation of errors affords him a new trial. Hanson waived his charging claim and fails to establish an error affecting a

Citations and pin cites are based on the Westlaw online version of the cited material.

constitutional right. Sufficient evidence supports the vehicular assault and felony hit and run convictions. His counsel was not ineffective. The prosecutor did not engage in misconduct. Hanson failed to demonstrate an accumulation of errors warranting reversal. Accordingly, we affirm and deny his petition.

FACTS

C.C. lived in an apartment with her teenage son in West Seattle. She lived near her friends Crystal Hansen[1] and Crystal's boyfriend, Christopher Alatorre. Alatorre worked a block away at West Seattle Brewing as an operations manager, and C.C. would occasionally visit the brewery.

Chayce Hanson is an owner of a barbeque restaurant, which is next door to West Seattle Brewery. The businesses share a parking lot. Hanson would patronize the brewery semi-regularly. Hanson and C.C. knew each other for a couple of years, and they had previously gone out for drinks in West Seattle.

One evening in February 2017, Hanson ordered a beer at the brewery. Hanson saw C.C. walking by and invited her for a drink. He ordered a beer for her. After about 45 minutes to an hour, they left for the Maharaja restaurant. The brewery bartender was not concerned about their levels of intoxication when they left.

At Maharaja, Hanson introduced C.C. to the bartender as a long-time friend. The bartender observed that they did not appear intoxicated when they arrived. Hanson bought a round of drinks for C.C. and himself. C.C. ordered a

---

[1] Because Chayce Hanson and Crystal Hansen have similar surnames, we refer to Crystal Hanson as "Crystal" for clarity.

"gin soda tall" that she sipped for an hour. C.C. felt buzzed after that one drink. Although someone bought C.C. a shot of tequila, she did not drink it. Later, the bartender observed that C.C. seemed intoxicated and pushed aside drinks, not wanting to drink them. The bartender testified that C.C. suddenly was acting more intoxicated than what she had to drink. C.C. and Hanson left around 11:20 p.m. Video footage shows C.C. unable to walk in a straight line and stumbling and supported by Hanson as she left Maharaja.

At 11:30 p.m., video footage from the brewery's parking lot depicted Hanson's truck pulling in with C.C. slumped over in the passenger seat. C.C. appeared to be incapacitated, limp to the touch, not functional or moving, and unresponsive. Hanson physically propped her up, put his hand inside her jacket and below her waist, and kissed her. C.C. was mostly unresponsive except for an attempt at pushing away Hanson's hand. C.C. testified that she had no recollection of this event, did not consent to it, and found it offensive after watching the video.

Alatorre testified to what Hanson later told him happened next regarding the collision. Sometime after Hanson left the parking lot, he was driving around a roundabout a few blocks away, C.C. flopped over, Hanson lost control, and he crashed his truck into a rock wall. Alatorre said Hanson explained he was "slightly buzzed" and "made a mistake." According to C.C., Hanson later told her he was "really wasted," should not have been driving, and that C.C. "hit her head on the windshield." The damage to the truck included a spider web crack on the windshield in front of where C.C. was seen sitting when Hanson left the brewery.

3

After the collision, Hanson left the scene without reporting the accident or calling for help.

The next morning, C.C. woke up to Hanson having sex with her in his apartment. C.C. testified that she woke up really confused and unable to speak despite wanting to tell Hanson to stop and that she wanted to go. C.C. had no recollection of anything that occurred between being at Maharaja and waking up in Hanson's bed while he was penetrating her. Blood matching C.C.'s deoxyribonucleic acid (DNA) was later found on a pillow in Hanson's bedroom.

Around 9:00 a.m., C.C.'s son called her on the phone. C.C.'s voice was choppy, she stuttered, and she could not fully understand what he was saying to her. Her son described C.C. as having "serious mental difficulty speaking[.]"

C.C. could not find all of her clothes before she left Hanson's apartment and wore only pants and shoes with her coat. She did not put more clothes on because she "didn't understand how to do that" and wanted to get home. Although she remembered leaving Hanson's apartment, she did not remember the walk home. C.C.'s bra and shirt were later found on her front porch. Because C.C. did not have her phone or keys, she went to Crystal's apartment. Crystal testified that C.C. could not speak well and had almost "zero communication ability." C.C. was able to communicate that she needed to go to the hospital, but she could not say anything else. She had dried blood on her face and hands, and her face was swollen.

Crystal took C.C. to the nearby hospital. C.C. had difficulty communicating with the doctors. So instead, they asked her to write down what

4

she was experiencing, but she was only able to repeatedly write her name. An ambulance then took C.C. and Crystal to Harborview Medical Center (Harborview).

An obstetrics/gynecology doctor (OB/GYN) at Harborview examined C.C. as part of a sexual assault examination that evening. The OB/GYN observed that C.C. was having physical and neurological issues. C.C. remembered that she had been with a man but not the details of what occurred or how she was injured.

A sexual assault nurse examiner also examined C.C. C.C. had significant word-finding difficulty. The examiner testified that C.C. was able to convey that she had sex with a man when she did not want to. C.C. also told the examiner that at the time C.C. could not talk, but she just wanted it to be done. Later, a DNA analysis of the semen recovered from a swab of C.C.'s perineal vulvar matched Hanson's DNA.[2]

Doctors determined C.C. had suffered an ischemic stroke in the area of her left frontal lobe, which was consistent with her communication problems. The cause of the stroke was contested at trial. The director of the comprehensive stroke center at Harborview, where C.C. was examined and treated, testified that, without any other compelling causes, trauma was the best assessment as the cause of C.C.'s stroke. A defense expert, managing partner of Neurological Associates of Washington, who did not examine C.C., testified that there was a

---

[2] A forensic scientist reported that the estimated probability of selecting an unrelated individual at random from the United States population with a matching profile is one in 1.1 undecillion.

"50/50 chance" that C.C.'s stroke was caused by a carotid web, which is an abnormality in the inside wall of the carotid artery.

About five days after the incidents, the police executed a search warrant on Hanson's truck, which had extensive damage to the front left corner. Swabs were taken from the inside surface of the smashed windshield. A detective also took samples from inside the truck, the seat and the passenger door, that he believed might be blood. The swab from the seat was not tested. A forensic scientist later matched C.C.'s DNA to the blood swab from the passenger door.

About two months later, Hanson saw C.C. walking by in the neighborhood and spent over an hour and half trying to convince her to sign a notarized statement that Hanson did not rape her. C.C. testified she was scared and that she told Hanson, in order to get out of the confrontation, she would meet him the next day. She immediately called a detective when she got inside her apartment. While she was on the phone with the detective, Hanson started pounding on her door, and C.C. was scared he would break in. She felt compelled to answer the door.

C.C. followed instructions from the detective to put her cell phone in her pocket with the detective on the line. The detective then used another phone to call 911 and relay what was happening and what she could hear in live time. C.C. said Hanson was getting more and more agitated because the phone number C.C. gave him was wrong, so he tried to get C.C. to say something on

6

his phone camera. At trial, part of the 911 recording was admitted.[3] The jury heard the detective tell the 911 dispatcher that she heard Hanson tell [C.C.] what he could lose if she does not help him and that he said, "I'm going to fucking prison. I'm going to fucking prison over this." Hanson was arrested shortly thereafter.

Additional facts are discussed below where relevant.

Hanson did not testify at trial. A jury found Hanson guilty of (1) rape in the second degree by engaging in sexual intercourse with another person when the other person is incapable of consent by reason of being physically helpless, (2) tampering with a witness, (3) assault (with intent to commit indecent liberties) in the second degree with sexual motivation, (4) felony hit and run, and (5) vehicular assault. At sentencing, the court imposed an indeterminate high-end sentence of 304 months for the rape conviction. Hanson's sentences for the remaining felony convictions were ordered to run concurrently.

Hanson filed a timely appeal. While that appeal was pending, he filed a PRP. We granted his request to consolidate the matters for review.

## DISCUSSION

### Equal Protection

Hanson raises for the first time in his direct appeal that the State violated his constitutional right to equal protection by failing to charge him with indecent liberties, instead of assault in the second degree with intent to commit indecent liberties, because the statutes are concurrent. We disagree.

---

[3] The redacted 911 recording, State's Exhibit No. 31, was not designated for appeal.

"No State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. 14. "No law shall be passed granting to any citizen, class of citizens, or corporation other than municipal, privileges or immunities which upon the same terms shall not equally belong to all citizens, or corporations." WASH. CONST. art. I, § 12.

"Equal protection is violated when two statutes declare the same acts to be crimes, but penalize more severely under one statute than the other." State v. Aamold, 60 Wn. App. 175, 179, 803 P.2d 20 (1991). Further, " 'equal protection of the laws is denied when a prosecutor is permitted to seek varying degrees of punishment when proving identical criminal elements.' " State v. McEnroe, 179 Wn. 2d 32, 44, 309 P.3d 428 (2013) (citing State v. Campbell, 103 Wn. 2d 1, 25, 691 P.2d 929 (1984)).

A party may claim an error for the first time on appeal if it concerns "(1) lack of trial court jurisdiction, (2) failure to establish facts upon which relief can be granted, [or] (3) manifest error affecting a constitutional right." RAP 2.5(a). Hanson's argument regarding equal protection does not fall within one of these exceptions.

"The defendant has the initial burden of showing that (1) the error was 'truly of constitutional dimension' and (2) the error was 'manifest.' " State v. Grimes, 165 Wn. App. 172, 185-86, 267 P.3d 454 (2011) (quoting State v. O'Hara, 167 Wn.2d 91, 98, 217 P.3d 756 (2009)). "A defendant cannot simply assert that an error occurred at trial and label the error 'constitutional'; instead,

he must identify an error of constitutional magnitude and show how the alleged error actually affected his rights at trial." Grimes, 165 Wn. App. at 186.

"When a specific statute and a general statute punish the same conduct, the statutes are concurrent and the State can only charge a defendant under the specific statute." State v. Wilson, 158 Wn. App. 305, 313-14, 242 P.3d 19, (2010) (citing State v. Shriner, 101 Wn.2d 576, 580, 681 P.2d 237 (1984); State v. Presba, 131 Wn. App. 47, 52, 126 P.3d 1280 (2005)). Whether statutes are concurrent involves examining the elements of the statutes, not the facts of the particular case. State v. Chase, 134 Wn. App. 792, 802-03, 142 P.3d 630 (2006).

The crimes of indecent liberties and assault in the second degree with intent to commit indecent liberties are not concurrent statutes.

Under RCW 9A.44.100, "[a] person is guilty of the felony of indecent liberties when he or she knowingly causes another person to have sexual contact with him or her or another . . . When the other person is incapable of consent by reason of being mentally defective, mentally incapacitated, or physically helpless." RCW 9A.44.100(1)(b). Further, sexual contact means "any touching of the sexual or other intimate parts of a person done for the purpose of gratifying sexual desire of either party or a third party." RCW 9A.44.010(13).

Under RCW 9A.36.021, "a person is guilty of assault in the second degree if he or she, under circumstances . . . with intent to commit a felony, assaults another. . ." RCW 9A.36.021(1)(e). The jury was instructed that assault was "an intentional touching of another person that is harmful or offensive regardless of

9

whether any physical injury is done to the person. A touching is offensive if the touching would offend an ordinary person who is not unduly sensitive." The State alleged that Hanson committed assault with the intent to commit indecent liberties.

While indecent liberties requires actually having sexual contact, assault in the second degree with the intent to commit indecent liberties does not require having sexual contact. The two crimes do not punish the same conduct. Thus, they are not concurrent statutes—which Hanson conceded at oral argument.[4] Because the crimes do not have identical elements, a prosecutor does not violate equal protection by electing to charge one crime over another.

Hanson also claims the State violated his equal protection rights because others in this state were convicted of indecent liberties under the physically helpless prong on facts "legally identical" to his case, yet he was charged with assault in the second degree instead of indecent liberties. A denial of equal protection may occur when a valid law is administered in a manner that unjustly discriminates between similarly situated persons. Stone v. Chelan County Sheriff's Dep't, 110 Wn. 2d 806, 811, 756 P.2d 736 (1988). Unequal enforcement will violate equal protection rights if deliberately or purposefully based upon unjustifiable standard such as race, religion or other arbitrary grounds. Id. When evaluating an equal protection claim, we must first determine

_____

[4] Wash. Court of Appeals oral argument, *State v. Hanson*, No. 80046-9-I (Nov. 2, 2021), at 3 min., 40 sec., *video recording by* TVW, Washington State's Public Affairs Network, https://tvw.org/video/division-1-court-of-appeals-2021111009/?eventID=2021111009.

whether the individual claiming the violation is similarly situated with other persons.  State v. Osman, 157 Wn. 2d 474, 484, 139 P.3d 334 (2006).

The State argued at trial that the basis for the assault in the second degree with sexual motivation was the incident in the truck where Hanson groped C.C.  The act underlying the charge in the instant case was captured by video camera.  C.C. had no memory of the event and could only testify that she was offended from what she viewed on the video.  The video showed Hanson kissing C.C. and reaching his hand inside her jacket and below her waist out of view of the camera while she appeared to be unconscious.

Hanson's evidence of similarly situated persons are eight opinions, only two of which are published, where the defendant was convicted of indecent liberties.  Hanson cites to no authority where a court has recognized factual circumstances from published and unpublished opinions as creating a class for the purposes of equal protection.  Also, we agree with the State that none of the cases Hanson cites were factually similar to the incident in the truck.[5]  Hanson has not shown membership in a class of similarly situated individuals.

---

[5] State v. Docktor, No. 81038-3-I, slip op. at 3 (Wash. Ct. App. Apr. 20, 2020 (unpublished) (victim woke up with her shirt around her neck and the defendant touching her nipples), https://www.courts.wa.gov/opinions/pdf/810383.pdf; State v. Jackin, No. 49116-8-II, slip op. at 2 (Wash. Ct. App. Apr. 10, 2018) (unpublished) (victim woke up to defendant with his hand inside her shorts rubbing her vagina), https://www.courts.wa.gov/opinions/pdf/D2%2049116-8-II%20Unpublished%20Opinion.pdf; State v. Ruiz, No. 71712-0-I, slip op. at 1-2 (Wash. Ct. App. June 15, 2015) (unpublished) (victim woke up to find defendant's penis exposed, his hand on victim's inner thigh, defendant's head in close proximity to victim's penis, and defendant admitted to fondling victim's penis), https://www.courts.wa.gov/opinions/pdf/717120.pdf; State v. Wright, No. 71506-2-I, slip op. at 2-3 (Wash. Ct. App. Mar. 2, 2015) (unpublished) (victim woke up with defendant whom she met the previous night

Moreover, "[p]rosecutors have broad discretion with respect to charging decisions." State v. Lee, 69 Wn. App. 31, 36, 847 P.2d 25 (1993). The prosecutor charged what the evidence supported.

Hanson fails to establish an error of constitutional dimension and thus waives this equal protection claims.

Sufficiency of the Evidence

Hanson claims in his PRP that the State failed to prove beyond a reasonable doubt that he committed vehicular assault and felony hit and run. We disagree.

To prevail on a PRP, Hanson bears the burden of proving by a preponderance of evidence that "he was actually and substantially prejudiced either by a violation of his constitutional rights or by a fundamental error of law." In re Pers. Restraint of Benn, 134 Wn.2d 868, 884, 952 P.2d 116 (1998); In re Pers. Restraint of Lord, 152 Wn.2d 182, 188, 94 P.3d 952 (2004). "Actual prejudice must be determined in light of the totality of circumstances." In re Pers. Restraint of Music, 104 Wn.2d 189, 191, 704 P.2d 144 (1985). In determining whether actual prejudice exists, we look to see if the error "so infected [the]

---

in a bar and the crotch of her jeans had been ripped open, which Wright testified was a consensual act), https://www.courts.wa.gov/opinions/pdf/715062.pdf; State v. Mohamed, 175 Wn. App. 45, 47, 301 P.3d 504 (2013) (victim woke up to defendant touching her vagina evidence and penis penetrating her vagina); State v. Stolle, noted at 159 Wn. App. 1006, 2010 WL 5343175 at *1 (victim felt defendant's penis touch her vagina and woke up with her underpants off); State v. Tucker, noted at 153 Wn. App. 1032, 2009 WL 4327062 at *1 (victim woke up to defendant fondling her breasts); State v. Puapuaga, 54 Wn. App. 857, 858, 776 P.2d 170 (1989) (victim woke up to defendant kneeling beside her bed with his hand under the covers, touching her crotch area).

petitioner's entire trial that the resulting conviction violates due process." Music, 104 Wn.2d at 191. An error warrants relief when the reviewing court has a "grave doubt as to the harmlessness of an error." In re Pers. Restraint of Sims, 118 Wn. App. 471, 477, 73 P.3d 398 (2003) (internal quotation marks omitted).

These threshold requirements are "necessary to preserve the societal interest in finality, economy, and integrity of the trial process. It also recognizes that the petitioner has had an opportunity to obtain judicial review by appeal." In re Pers. Restraint of Delgado, 160 Wn. App. 898, 903, 251 P.3d 899 (2011).

"Sufficiency of the evidence is a question of constitutional magnitude because due process requires the State to prove its case beyond a reasonable doubt." In re Pers. Restraint of Tortorelli, 149 Wn.2d 82, 93, 66 P.3d 606 (2003) (citing State v. Baeza, 100 Wn.2d 487, 488, 670 P.2d 646 (1983)). "A sufficiency challenge admits the truth of the State's evidence and accepts the reasonable inferences to be made from it." State v. O'Neal, 159 Wn.2d 500, 505, 150 P.3d 1121 (2007). Evidence is sufficient if, " 'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " State v. Green, 94 Wn.2d 216, 221, 616 P.2d 628 (1980) (quoting Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979)). Circumstantial and direct evidence carry equal weight. State v. Goodman, 150 Wn.2d 774, 781, 83 P.3d 410 (2004). "Credibility determinations are for the trier of fact and are not subject to review." State v. Thomas, 150 Wn.2d 821, 874, 83 P.3d 970 (2004). Accordingly, we "defer to the trier of fact on issues of conflicting testimony,

credibility of witnesses, and the persuasiveness of the evidence." Thomas, 150 Wn.2d at 874-75. We will reverse a conviction "only where no rational trier of fact could find that all elements of the crime were proved beyond a reasonable doubt." State v. Smith, 155 Wn.2d 496, 501, 120 P.3d 559 (2005).

*A. Vehicular Assault*

Hanson's first argument has more to do with how the State chose to prove vehicular assault than whether evidence was sufficient to support the crime as charged. The State charged Hanson with vehicular assault for driving or operating a vehicle "while under the influence of intoxicating liquor or any drugs, as defined by RCW 46.61.502" and causing substantial bodily harm.

Hanson contends that the prosecution "relying on the 'affected by' clause was plain error, as this failed to describe a distinct type of conduct that could reasonably be interpreted as creating alternative means." While not altogether clear, it appears Hanson cites to State v. Sandholm for the proposition that "under the influence of" or "affected by" are alternative means of committing the crime of driving under the influence and that the State was required to prove that Hanson's blood-alcohol concentration was 0.08 or greater under RCW 46.61.502(1)(a), which defines the crime driving under the influence. 184 Wn.2d 726, 734, 364 P.3d 87 (2015). However, our Supreme Court in Sandholm concluded the opposite:

> [T]he DUI statute's "affected by" clauses do not describe multiple, distinct types of conduct that can reasonably be interpreted as creating alternative means. Rather, those portions of the DUI statute contemplate only one type of

14

conduct: driving a vehicle under the "influence of" or while "affected by" certain substances that may impair the driver.

Id. at 735.[6]  Hanson fails to recognize that vehicular assault may be committed while the driver is "under the influence of intoxicating liquor or any drug, as defined by RCW 46.61.502."  RCW 46.61.522(1)(b).  "There are two ways to prove driving while under the influence of intoxicating liquor under RCW 46.61.502: (1) by showing the defendant's blood alcohol level was at least 0.08 within two hours after driving or (2) by evidence tending to show the defendant was under the influence of alcohol and/or other drugs."  State v. Brown, 145 Wn. App. 62, 69, 184 P.3d 1284 (2008) (emphasis added); RCW 46.61.502(1)(a), (c). The State was not required to prove his alcohol concentration was 0.08 or higher.

Hanson next argues that "although there was evidence that petitioner had consumed some alcohol prior to the accident, there was a complete absence of any evidence of being under the influence of or affected by intoxicants."  He further argues that the evidence that was submitted permitted the jury to "speculate as to the existence of a fact not supported by the evidence."  We disagree.

At trial, the jury was instructed that in order to find Hanson guilty of vehicular assault, it would have to find Hanson's "driving proximately caused substantial bodily harm to another person" and that "at the time [Hanson] was under the influence of intoxicating liquor."  The jury was further instructed that a "person is under the influence of intoxicating liquor when the person's ability to

---

[6] The court in Sandholm discusses Former RCW 46.51.502 (2008), but the clause at issue remains the same as the current version of the statute.

drive a motor vehicle is lessened in any appreciable degree as a result of intoxicating liquor."

Because Hanson did not testify, and C.C. had no memory of the accident, there were no eyewitness accounts of the actual accident. However, a conviction may be based on circumstantial evidence. The jury was instructed on the evidence it may consider:

> The evidence that has been presented to you may be either direct or circumstantial. The term "direct evidence" refers to evidence that is given by a witness who has directly perceived something at issue in this case. The term "circumstantial evidence" refers to evidence from which, based on your common sense and experience, you may reasonably infer something that is at issue in this case.
>
> The law does not distinguish between direct and circumstantial evidence in terms of their weight or value in finding the facts in this case. One is not necessarily more or less valuable than the other.

Witness testimony and video footage established Hanson had at least two drinks in less than an hour at the brewery. About 10 minutes after leaving the brewery, C.C. and Hanson entered the Maharaja restaurant. A detective who viewed security footage from the restaurant testified that Hanson ordered three drinks for himself while at the restaurant. A Maharaja bartender also testified that someone else bought each of them a tequila shot. Alatorre, the brewery's operations manager, testified that Hanson said he was "slightly buzzed" and had "made a mistake" in explaining the accident. Hanson said that he was going up the street, C.C. flopped over, he lost control, went around the island, and hit a brick wall or rock wall. When asked, "And when you talk about Chayce allegedly telling you that it could happen to anybody, he was talking about the accident, right?"

16

Alatorre answered, "Yeah, just, you know, being intoxicated.  And, you know, wrecking the car.  It could happen to anybody."  C.C. also testified that Hanson, months later, told C.C. that he was "really wasted, and he shouldn't have driven his car" that night.

Sufficient evidence provided a basis for a jury to find that Hanson was under the influence at the time of the accident.

*B. Felony Hit and Run*

Hanson alleges insufficiency of the evidence as to only one element of the felony hit and run conviction—that the accident resulted in injury to C.C.  Hanson repeats the defense theory argued at trial: C.C.'s physical injuries suggested she fell somewhere else, but her injuries did not occur inside the truck as a result of the accident.  The jury rejected this theory.

C.C. appeared on video in the parking lot of the brewery unbuckled in Hanson's undamaged truck after leaving Maharaja and without any signs of bleeding or injuries on her face.  As discussed above, Hanson admitted to driving the vehicle and hitting a wall while C.C. was in the truck, causing C.C. to hit her head on the windshield.  The day after the accident, the truck's windshield had a spider web crack.  It was undisputed that C.C. had suffered an ischemic stroke prior to being admitted to the hospital the day after the accident.  The cause of the stroke was disputed at trial.

However, we review the evidence in the light most favorable to the prosecution.  State v. Green, 94 Wn.2d at 221.  The jury heard testimony from the State's expert and C.C.'s treating physician, Tirschwell, a professor of

neurology at the University of Washington and medical director of the comprehensive stroke center at Harborview Medical Center. He testified that C.C. could have suffered trauma causing a small dissection, an injury to a blood vessel, which created a blood clot that broke off and caused the stroke. Tirschwell testified that C.C. was in an age group where "trauma and dissections are a fairly frequent cause of stroke." Although a dissection was not detected from an angiogram, Tirschwell explained:

> Dissections as is the case for all biology come in a huge range of severities, and so the more significant and severe dissections we can usually see on a CT angiogram, but it's hypothesized that dissections can be so small that our imaging just isn't able to pick them up. So just because a CT angiogram was negative doesn't absolutely eliminate the possibility that there could have been a small dissection. . . . I think because we weren't seeing any severe narrowing [in blood vessels], and we had this history of trauma that we were suspicious of the possibility of a small dissection that we couldn't image that might have caused the blood clot to form[,] break off and then cause her stroke.

Defense expert Naini, managing partner of Neurological Associates of Washington, testified that dissections are defined based on what the imaging study shows, "so if you don't see anything on the scan on the image study of the vessel, then they don't have dissection." Naini testified that there was a "50/50 chance" that C.C.'s stroke was caused by a carotid web, which is an abnormality in the inside wall of the carotid artery. Naini also testified that "the type of stroke that [C.C.] had was one where the blood flow to that part of brain was occluded by a clot or something. Something that sort of stopped the blood flow. And that's not really something that's caused by trauma to the brain or to the blood vessel

18

really. . . . Unless there is a dissection of some structural reason why the clot would form."

Tirschwell explained that although doctors found C.C. had a carotid web, "it was probably there for quite some time before any of the events in question here, and they are usually very stable lesions. Many people probably live with them without having any symptoms at all as she had for forty odd years." He added that there was no indication that C.C. had a susceptibility to stroke or had previously suffered strokes. Tirschwell testified that it seemed "very unlikely" that C.C. coincidentally had a stroke in the setting of events that included a motor vehicle accident. When asked to give his general conclusion about what caused C.C.'s stroke, Tirschwell testified, "I think our best assessment at that point in time, without any other compelling causes, was that the trauma was related to the cause of the stroke."

After viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the essential elements of vehicular assault and felony hit and run beyond a reasonable doubt.

<u>Ineffective Assistance of Counsel</u>

Hanson also contends on direct appeal that he was prejudiced because his trial attorney was ineffective for (1) failing to file a pretrial offer of proof as to the relevancy of C.C.'s sexual history, (2) failing to object when the State violated the court's pretrial ruling by opening the door to C.C.'s sexual history, and (3) failing to propose a reasonable belief instruction. All these alleged errors are

related to C.C.'s sexual history, which was heavily discussed during motions in limine.

Defense counsel contended, and the State did not dispute, that according to C.C.'s medical records, at some time while she was at the hospital she indicated that she knew her assailant, and that they previously had one consensual sexual intercourse encounter about two or three months prior. However, in a defense interview, C.C. denied ever having consensual sexual intercourse with Hanson. In the interview, C.C. stated she had only one other previous sexual encounter with Hanson eight months prior, and it was under similar nonconsensual circumstances of drinking together—blacking out despite not drinking that much, waking up naked on her couch, and feeling like someone had sex with her.

During motions in limine, the State sought to exclude evidence of C.C.'s prior sexual behavior under the rape shield statute. Defense counsel, without submitting a written pretrial motion with an offer of proof, argued that Hanson should be allowed to introduce C.C.'s inconsistent statements regarding her past sexual history with Hanson because they would speak to her credibility. After consideration of the parties' arguments, the court ruled that whether or not a past encounter was consensual or not was a collateral matter and should be excluded. Defense counsel asked a clarifying question after the initial ruling: "So when [C.C.] makes a statement that's directly in opposition to previous statements with regards to this I'm not going to be able to impeach her?" The

court responded by explaining, "She is not going to make any statements. She is not going to be able to talk about it."

" 'Because claims of ineffective assistance of counsel present mixed questions of law and fact, we review them de novo.' " State v. Linville, 191 Wn.2d 513, 518, 423 P.3d 842 (2018) (quoting In re Pers. Restraint of Brett, 142 Wn.2d 868, 873, 16 P.3d 601 (2001)).

A defendant in a criminal case has the right to conflict-free counsel to represent him. U.S. CONST. amend. VI; WASH. CONST. art. I, § 22; Wheat v. United States, 486 U.S. 153, 159, 108 S. Ct. 1692, 100 L. Ed. 2d 140 (1988). Further, "the right to counsel is the right to effective assistance of counsel." State v. Humphries, 181 Wn.2d 708, 728, 336 P.3d 1121 (2014) (quoting Strickland v. Washington, 466 U.S. 668, 686, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)). "To prevail on a claim of ineffective assistance of counsel, [the defendant] must establish both deficient performance and prejudice." State v. Jones, 183 Wn.2d 327, 330, 352 P.3d 776 (2015) (citing Strickland, 466 U.S. at 687).

"Deficient performance is performance falling 'below an objective standard of reasonableness based on consideration of all the circumstances.' " State v. Kyllo, 166 Wn.2d 856, 862, 215 P.3d 177 (2009) (quoting State v. McFarland, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). We are highly deferential to the performance of counsel in evaluating the reasonableness of their actions. State v. Crawford, 159 Wn.2d 86, 98, 147 P.3d 1288 (2006). "There is a strong presumption that trial counsel's representation was adequate, and exceptional

deference must be given when evaluating counsel's strategic decisions." State v. McNeal, 145 Wn.2d 352, 362, 37 P.3d 280 (2002).

Deficient performance prejudices a defendant when a "substantial" likelihood of a different outcome exists; it is not enough for a different outcome to be merely "conceivable." In re Pers. Restraint of Lui, 188 Wn.2d 525, 538-39, 397 P.3d 90 (2017). If a defendant fails to satisfy either prong of the test, the inquiry ends. State v. Hendrickson, 129 Wn.2d 61, 78, 917 P.2d 563 (1996).

*A. Offer of Proof*

Hanson contends that he was prejudiced by his counsel failing to file a written motion and offer of proof to pierce the rape shield statute, RCW 9A.44.020. We disagree. The relevant portions of the rape shield statute provide:

> (2) Evidence of the victim's past sexual behavior . . . is inadmissible on the issue of credibility and is inadmissible to prove the victim's consent except as provided in subsection (3) of this section, but when the perpetrator and the victim have engaged in sexual intercourse with each other in the past, and when the past behavior is material to the issue of consent, evidence concerning the past behavior between the perpetrator and the victim may be admissible on the issue of consent to the offense.
>
> (3) In any prosecution for the crime of rape . . . evidence of the victim's past sexual behavior . . . is not admissible if offered to attack the credibility of the victim and is admissible on the issue of consent, except where prohibited in the underlying criminal offense, only pursuant to the following procedure:
>
> (a) A written pretrial motion shall be made by the defendant to the court and prosecutor stating that the defense has an offer of proof of the relevancy of evidence of the past sexual behavior of the victim proposed to be presented and its relevancy on the issue of the consent of the victim.
>
> (b) The written motion shall be accompanied by an affidavit or affidavits in which the offer of proof shall be stated.

22

. . . .

(4) Nothing in this section shall be construed to prohibit cross-examination of the victim on the issue of past sexual behavior when the prosecution presents evidence in its case in chief tending to prove the nature of the victim's past sexual behavior, but the court may require a hearing pursuant to subsection (3) of this section concerning such evidence.

RCW 9A.44.020.

The trial court gave Hanson an opportunity to provide a written declaration as to what evidence he intended to offer for the court's consideration. Hanson did not provide a written offer of proof. The trial court correctly noted that the issue was not whether C.C. consented, but whether she was capable of consenting. The State alleged that Hanson engaged in sexual intercourse with C.C. under circumstances where C.C. was physically helpless. Despite being given an opportunity to do so, Hanson made no offer of proof that C.C. was not physically helpless at the time Hanson engaged in sex with her. Hanson also made no offer of proof as to how a previous sexual encounter supported a defense theory that C.C. consented to sexual intercourse with Hanson on this occasion.

On appeal, Hanson contends that the trial court's ruling "prevented [Hanson] from testifying to the 'full picture' of his version of events."

Nothing prohibited Hanson from providing testimony to the trial court that he intended to testify in support of his argument to admit C.C.'s sexual history. In fact, the trial court invited Hanson to do just that. Before making its ruling, the trial court told defense counsel, "I'm going to have you take a look at the rape shield rule. Give me the written declaration that I'm entitled to so I know exactly

23

what it is you want to offer, and please be as specific as possible." While the record paints a picture as to why Hanson may not have wanted to subject himself to cross-examination, nothing in the record suggests the trial court prevented him from making an offer of proof or testifying to his version of events.

Hanson further summarily concludes on appeal that "[Hanson] reasonably believed that on February 2, 2017, C.C. had not suffered from a stroke, but was simply intoxicated – like she had been previously – and was capable of consent or did consent." Insofar as this claim amounted to the offer of proof that counsel was aware of and should have presented to the court, defense counsel's performance was not deficient in failing to present this conclusory statement as an offer of proof, especially in light of the video evidence of Hanson groping unresponsive C.C. prior to the collision and stroke. Consent was not at issue because the State had to prove that "the sexual intercourse occurred when [C.C.] was incapable of consent by reason of being physically helpless or mentally incapacitated."

Hanson fails to establish that his counsel's performance was deficient for not providing an offer of proof.

*B. Failing to Object/Opening the Door*

Hanson next contends in his direct appeal that his trial counsel was ineffective for not objecting to certain statements he believes opened the door to C.C. and Hanson's past sexual history. We disagree.

At issue are three statements suggesting that C.C. did not have a relationship with Hanson. The first is when the prosecutor asked the Maharaja

24

bartender about when Hanson and C.C. arrived at the restaurant. The prosecutor asked, "When they came in what was the – you know, what did their relationship appear to be?" The bartender responded that they appeared to be "[j]ust friends." The prosecutor asked how she knew that, and she responded that Hanson had repeatedly told her.

The second statement by C.C.'s neighbor, Crystal, came up during cross examination by defense. Crystal agreed she had no knowledge about text messages between C.C. and Hanson. Crystal added, "All I know is her relationship." Defense counsel followed up asking, "Her relationship with whom?" Crystal responded that C.C. "didn't have a relationship with anyone." C.C.'s son made the third statement at issue when the prosecutor asked whether Hanson and C.C. had a romantic relationship. Her son responded, "No. None whatsoever."

When defendants base their ineffective assistance of counsel claim on their trial counsel's failure to object, defendants must show that the objection would likely have succeeded. State v. Gerdts, 136 Wn. App. 720, 727, 150 P.3d 627 (2007). Counsel performs deficiently by failing to object to inadmissible evidence absent a valid strategic reason. State v. Saunders, 91 Wn. App. 575, 578, 958 P.2d 364 (1998). Reversal is required if an objection would likely have been sustained and the result of the trial would have been different without the inadmissible evidence. Id.

The court likely would not have sustained an objection to the answer given in response to defense counsel's own question. We now address the answers

25

given in response to the prosecutor's questions about the nature of Hanson's relationship with C.C. Hanson assumes that an objection would have allowed him to argue that the State opened the door to admit C.C.'s sexual history with Hanson. However, assuming without deciding that such testimony did just that, C.C. would have testified that her previous sexual encounter with Hanson was under similar nonconsensual circumstances—another act of rape. This testimony could hurt and not help Hanson.

Even if the trial court would have sustained an objection, it likely would have, at most, instructed the jury to disregard rather than admit C.C.'s sexual history based on the court's previous ruling. Under these circumstances, it was reasonable for defense counsel to avoid drawing attention to the statements with an objection.

Defense counsel's failure to object did not fall below the objective standard of reasonableness because it was not done absent of a valid strategic reason. Moreover, Hanson must establish prejudice and did not do so. He fails to show a reasonable probability that the verdict on any charge would have been different had the State not presented statements suggesting C.C. and Hanson were just friends and not in a relationship.

*C. Reasonable Belief Instruction*

Hanson next contends he was prejudiced because his counsel was ineffective for failing to request a reasonable belief instruction. We disagree.

A person is guilty of rape in the second degree if he or she "engages in sexual intercourse with another person . . . When the victim is incapable of

consent by reason of being physically helpless or mentally incapacitated[.]"

RCW 9A.44.050(1)(b). In certain situations, reasonable belief is an affirmative

defense to rape in the second degree: "it is a defense which the defendant must

prove by a preponderance of the evidence that at the time of the offense the

defendant reasonably believed that the victim was not mentally incapacitated

and/or physically helpless." RCW 9A.44.030(1); see also In re Pers. Restraint of

Hubert, 138 Wn. App. 924, 929, 158 P.3d 1282 (2007).

"A defendant is entitled to have his theory of the case submitted to the jury

under appropriate instructions when the theory is supported by substantial

evidence in the record." State v. Griffith, 91 Wn.2d 572, 574, 589 P.2d 799

(1979); State v. O'Dell, 183 Wn.2d 680, 687, 358 P.3d 359 (2015). By extension,

a defendant is entitled to a jury instruction for an affirmative defense if sufficient

evidence supports the defense. State v. Fisher, 185 Wn.2d 836, 848-49, 374

P.3d 1185 (2016).

Defense counsel's performance was not deficient for failing to request a

reasonable belief instruction because the evidence did not support such an

instruction. There was overwhelming unchallenged evidence establishing that

C.C. was physically helpless at the time Hanson engaged in sexual intercourse

with her. Nor did Hanson present any evidence that, at the time of the event, he

reasonably believed that C.C. was not physically helpless.

Video footage captured Hanson groping C.C. while she was unresponsive.

Hanson admitted to a friend that C.C. had flopped over while he was driving

around a roundabout and he crashed the truck into a rock wall. Physical

27

evidence established a spider web crack in the windshield of the truck where C.C. had been sitting, her blood on the truck's passenger door handle, and blood on the pillow in Hanson's bedroom. Witnesses established that C.C., after having sex with Hanson, still had dried blood on her swollen face and hands, and that she had great difficulty communicating. C.C. testified that she woke up really confused and unable to speak despite wanting to tell Hanson to stop and that she wanted to go. The evidence did not support a reasonable belief instruction.

Hanson also asserts additional claims of ineffective assistance of counsel through his statement of additional grounds (SAG) along with his PRP. He claims that his counsel was ineffective for (1) failing to request a Frye[7] hearing regarding the testimony of the State's expert Tirschwell, (2) failing to request a continuance when the State added additional charges on the first day of trial, (3) conceding that Hanson committed hit-and-run, and (4) failing to introduce C.C.'s crime of dishonesty.

*D. Frye Hearing*

Hanson contends that counsel failed to request a Frye hearing regarding Tirschwell's expert testimony. Hanson asserts that "[i]t's impossible to have a[n] embolic stroke from trauma." Thus, he argues, the "prosecutor encouraged or allowed false evidence to be presented to the jury. He knowingly and deliberately deceived the court and jurors." We disagree.

---

[7] Frye v. United States, 54 App. D.C. 46, 293 F. 1013 (1923).

In determining the admissibility of evidence based on novel scientific theories or methods, Washington courts employ the "general acceptance" standard set forth in Frye. State v. Pigott, 181 Wn. App. 247, 249, 325 P.3d 247 (2014). Under Frye, novel scientific evidence is admissible if it is based on a theory or principle that is generally accepted in the relevant scientific community, but not admissible if qualified experts have significant disputes as to its validity. Id. Evidence not involving new methods of proof or new scientific principles is not subject to examination under Frye. State v. Baity, 140 Wn.2d 1, 10, 991 P.2d 1151 (2000). The Frye test "applies where either the theory and technique or the method of arriving at the data relied upon is so novel that it is not generally accepted by the relevant scientific community." Anderson v. Akzo Nobel Coatings, Inc., 172 Wn. 2d 593, 611, 260 P.3d 857 (2011). There is nothing novel about the theory that trauma may cause a dissection, which may, in turn, cause a stroke. Hanson's own expert testified that an acute trauma could have caused a stroke if there is a dissection.

Hanson appears to base his argument on the fact that his expert, who admittedly did not examine C.C. and based his opinion on limited medical records, testified that the stroke was not caused by trauma because no dissection was detected. However, "[m]any medical opinions on causation are based upon differential diagnoses. A physician or other qualified expert may base a conclusion about causation through a process of ruling out potential causes with due consideration to temporal factors, such as events and the onset of symptoms." Anderson, 172 Wn. 2d at 610.

29

At trial, Tirschwell described the results of C.C.'s angiogram. He stated that initially, the scan did not show a dissection in her brain, which is a tear to the inside of a blood vessel that can sometimes indicate a trauma-induced stroke. However, he stated that although a dissection was not completely apparent, his team was suspicious of the possibility of a small undetectable dissection that might have caused the blood clot to form, break off, and then cause C.C.'s stroke. Tirschwell testified that "everybody else in the stroke profession believes, that our imaging isn't necessarily sensitive enough to pick up all the small dissections that do occur." Tirschwell also explained how he ruled out other causes of strokes, and that his general conclusion five days after the accident was that the trauma was related to the cause of the stroke. Additionally, he explained that although he observed blood vessels with a small amount of plaque on the walls, C.C. was not necessarily susceptible to having strokes. He maintained it was unlikely she had a stroke completely unrelated to the trauma.

Hanson's counsel's performance was not deficient for not requesting a Frye hearing.[8]

*E. Trial Continuance*

Hanson contends his trial counsel, in order to adequately prepare, should have requested a continuance on the first day of trial when the State amended its information. He also contends the State did not provide constitutionally sufficient

---

[8] It follows that Hanson's claim that the prosecutor introduced false testimony from Tirschwell also fails. While the defense expert and Tirschwell disagreed as to the cause of the stroke, differing medical opinions do not support a claim that the prosecutor knowingly introduced false evidence.

notice to the defense. Hanson is correct that the State amended its information by adding the charges of assault in the second degree with sexual motivation, felony hit and run, and vehicular assault on the first day of trial. However, the court noted and defense counsel acknowledged that notice of the added charges was provided previously in the omnibus order. Hanson had sufficient time to retain an expert witness to attack whether C.C.'s injuries were caused by the accident. Counsel's performance was not deficient for not requesting a continuance on the first day of trial.

*F. Conceding Felony Hit and Run*

Hanson argues in his PRP that his counsel was ineffective for misstating evidence about blood in his truck and conceding Hanson was guilty of hit and run. We disagree.

Counsel's performance is not deficient where it can be "characterized as legitimate trial strategy or tactics." State v. Kyllo, 166 Wn.2d at 863. Thus, decisions and conduct which relate to the theory of the case or trial strategy will generally not support a claim of ineffective assistance of counsel. State v. Grier, 171 Wn.2d 17, 33, 246 P.3d 1260 (2011). Hanson first contends that his counsel was ineffective for misstating the evidence about the blood found in Hanson's truck during closing argument. He takes issue with his counsel stating C.C.'s blood was on the passenger door. He argues that statement left the jury "with assumptions that the witness was injured inside of the vehicle at the time of the accident." First, defense counsel did not misstate the evidence about the blood—he correctly stated C.C.'s DNA was detected from the mark on the door

of the truck. A swab taken from the right front door of the truck tested positive for the presence of blood and DNA from the swab matched a sample from C.C. Second, there was a strategic reason for stating the blood was on the door of the truck. Defense counsel contrasted that finding with the lack of blood found anywhere else inside the truck and argued,

> The mark on the door with her DNA indicates to me that she got in and out of that truck at some point after her alleged injury, which also indicates to me that she was not unconscious. Furthermore, and if you were paying close attention you catch this, when they showed the injuries to her hands she had an injury to her palm right on the side. She had injuries to her knuckles. . . . That injury, ladies and gentlemen, is consistent with a fall. We know that she was inebriated that evening, and if you think about it what do you do when you fall? You skin knuckles. You create injuries to the palm of your hand.

Defense made a strategic decision to not ignore the undisputed evidence of C.C.'s physical injuries and, instead, used it to support the defense theory that C.C. was injured before she got inside the vehicle and that she was not unconscious. This assertion supported counsel's argument that C.C. was not injured as a result of the accident and was not physically helpless when she had sexual intercourse with Hanson. Defense counsel's statement about C.C.'s DNA on the passenger door did not fall below the objective standard of reasonableness.

Hanson next contends that his trial counsel was ineffective for conceding that Hanson was guilty of felony hit and run. During closing argument, defense counsel stated:

> I will tell you something else. The hit and run charge, he is guilty of it. He is guilty. I have no defense for that. The only problem I have with that is the subsection that talks about failure to administer aid

32

> to someone who is injured in the accident. Based on the forensics I don't believe and I do believe though that she was - that she was not injured in the truck. I don't believe she was injured in the truck. I do believe that she was injured some other way somewhere else. I believe she fell.

Conceding guilt can be a valid trial tactic when evidence of the admitted crimes is overwhelming. State v. Hermann, 138 Wn. App. 596, 605, 158 P.3d 96 (2007). With the overwhelming evidence discussed above, Hanson conceded guilt on the less serious charges[9] to gain credibility with the jury on the more serious charges of rape and vehicular assault. Defense counsel explained to the jury, "I have been very forthright with you about each and every last one of these charges, and why he is guilty of some and not of others." Defense counsel argued in great detail why the evidence suggested C.C. was not injured as a result of the accident and also not physically helpless during sexual intercourse. This theory supported defense request for the jury to find Hanson guilty of the lesser included crime of assault in the fourth degree with sexual motivation and not guilty of vehicular assault, assault in the second degree, and rape.

Under these facts, counsel's defense strategy of conceding the less serious charge to gain credibility with the jury for the more serious charges did not fall below the objective standard of reasonableness.

G. C.C.'s Criminal History

Hanson next argues his trial counsel should have impeached C.C. with her previous theft conviction. The rules of evidence allow using crimes of

---

[9] Defense counsel also conceded guilt on the charge of tampering with a witness.

33

dishonesty to attack the credibility of a witness.  ER 609(a).  However, the rule provides time limits:

> Evidence of a conviction under this rule is not admissible if a period of more than 10 years has elapsed since the date of the conviction or of the release of the witness from the confinement imposed for that conviction, whichever is the later date, unless the court determines, in the interests of justice, that the probative value of the conviction supported by specific facts and circumstances substantially outweighs its prejudicial effect.

ER 609(b).  C.C.'s conviction was from 1995.  Hanson fails to establish that counsel would have succeeded to persuade the court that the probative value of her almost 24-year-old conviction outweighed its prejudicial effect.

Defense counsel's performance was not deficient because C.C.'s 24-year-old theft conviction was inadmissible.

*H.  More Statement of Additional Grounds*

Hanson also contends in his SAG that his counsel was ineffective when he did not interview "many of the states [sic] witnesses" and "never filed a brief by 3/19 which the Trial Court required him to do."  These statements are not sufficient to allow for review.  In a SAG, "[r]eference to the record and citation to authorities are not necessary or required, but the appellate court will not consider a defendant's statement of additional grounds for review if it does not inform the court of the nature and occurrence of alleged errors."  RAP 10.10(c).

Next, Hanson contends his counsel was ineffective because he did not provide the State with a witness list, filed the medical subpoena incorrectly and late, and disclosed his expert witness late.  Hanson fails to establish how he was prejudiced because of these claimed errors.

Hanson also claims his counsel was ineffective because he drew an objection with his first sentence of his opening statement. His counsel began the opening statement as follows:

> You will find as you sit in this jury box that this case, that these cases, these stories, these events like so many other things we encounter in our lives actually unfold, and that if everything that you just heard, if the State's case was 100 percent true as just told, if that was correct, none of us would be here.

The trial court sustained the State's objection and the court reminded defense counsel that "this is opening statement." However, Hanson must do more than point to the sustained objection to suggest counsel made a mistake. Hanson must show that the error caused prejudice. He fails to make any such argument and the record does not show that it had any likelihood of affecting the verdict.

### Prosecutorial Misconduct

Hanson, in his SAG, next argues that the State committed prosecutorial misconduct. We disagree.

To prevail on a prosecutorial misconduct claim, a defendant must demonstrate that a prosecutor's conduct was both improper and prejudicial. State v. Emery, 174 Wn.2d 741, 756, 278 P.3d 653 (2012). To show prejudice, a defendant must show there is a "substantial likelihood" the prosecutor's misconduct affected the jury's verdict. State v. Thorgerson, 172 Wn.2d 438, 442-43, 258 P.3d 43 (2011). Where a defendant fails to object to a prosecutor's improper statement, the defendant waives the error unless the statement is so "flagrant and ill intentioned" that the prejudice could not have been remedied by an instruction to the jury. State v. Thorgerson, 172 Wn.2d at 443.

A prosecutor has wide discretion to make reasonable inferences from the evidence. In re Glasmann, 175 Wn.2d 696, 704, 286 P.3d 673 (2012). However, prosecutors act improperly when they seek a conviction based upon emotion rather than reason. State v. Craven, 15 Wn. App. 2d 380, 385, 475 P.3d 1038 (2020).

*A. DNA Statement*

Hanson first asserts the State committed prosecutorial misconduct because the State argued facts not in evidence and made "prejudicial misleading statements." We disagree.

Hanson first takes issue with the following statement by the State:

> So not every single time someone touches something that - excuse me. DNA is not going to be left behind every time someone touches an object. It's just a fact. And you heard Washington State Patrol Crime Lab testify about that. You heard other witnesses testify about that as well.

Hanson did not object, but argues now that this was not a reasonable inference because the forensic scientist testified that "if you touch a [sic] object you leave DNA."

However, the record establishes that the forensic scientist testified about instances when "there are times when no DNA is detected or very little." In those instances, she explained that the likelihood of receiving a DNA profile is very low to none. The State made a reasonable inference that not every single time someone touches something that DNA will be left behind, or as the forensic expert said, DNA will not always be detectable. In context of the trial testimony, this statement was a reasonable inference.

36

Second, Hanson takes issue with the prosecutor's statement in closing that there were "massive amounts of blood in Hanson's truck." The prosecutor, in closing, argued that "She bled all over the inside of his truck." Hanson incorrectly concludes that because forensic testing could not confirm that the blood on the truck door handle was "human" blood and that the swab of a stain that appeared to be blood was not tested, that the State could not argue that C.C. bled all over the inside of the truck. The forensic scientist explained that the quality of the sample can make it difficult to determine if blood is human, but that does not necessarily mean it is not human blood. Crystal described C.C. the day after the accident as "very bloody." Also, Hanson's truck was not swabbed for evidence until five days after the incident, which presumably gave him time to clean it. The prosecutor made a reasonable inference by stating that C.C. had "bled all over the inside of his truck" in closing argument.

Third, Hanson takes issue with the State's statement, "Instead he took her back to his apartment, and raped her while she bled on his sheets." He contends that "[t]here was absolutely [sic] no blood on any sheets anywhere." However, there is evidence that she was in a car accident, her DNA was on his pillow, she woke up to Hanson penetrating her on his bed, and Crystal said C.C. looked bloody the next morning. When police tried to gather the bed sheets, they were in the washing machine and observed a seemingly new set of sheets on the bed. The prosecutor again made a reasonable inference.

Fourth, Hanson takes issue with the prosecutor's statement that the bruises and cuts on C.C.'s hands in all likelihood came from Hanson trying to

drag her out of the car after they got in the accident and back to his apartment. There was evidence that C.C. was unconscious when Hanson groped her in his truck and that she was flopped over during the car accident. This was another reasonable inference by the prosecutor.

Moreover, Hanson did not object to any of these statements and they were not so "flagrant and ill intentioned" that the prejudice could not have been remedied by an instruction to the jury. State v. Thorgerson, 172 Wn.2d at 443. Even if any of these statements were improper, Hanson waived these claims.

*B. Vouching for Credibility.*

Hanson also claims the prosecutor improperly vouched for C.C.'s credibility. During closing argument, the prosecutor stated:

> Now, are people capable of lying? They absolutely are. But what you need to think about is why people lie. And the main reason people lie is for some gain or to get themselves out of trouble. Not to be forced to talk about the lowest, worst, most embarrassing moments of their lives. So think about [C.C]'s testimony for a minute. Think back to when she was on that stand. [C.C] didn't hesitate. She didn't hmm or haw when she told you about how she was incapable of consenting to the sex the defendant was forcing on her. She wasn't chomping at the bit to get the defendant in trouble for crimes he didn't commit. [C.C] wasn't excited to relive waking up to being raped by the defendant. In fact, she was in tears. She sat in that chair and she bared her soul. *She recounted the worse* [sic] *experiences of her life and she was credible.*

(Emphasis added.)

Additionally, the prosecutor explained to the jury that "the words of a believable victim like [C.C.]" can prove the State's case beyond a reasonable doubt in addition to the other evidence the prosecutor presented.

38

A prosecutor is afforded "wide latitude" during closing argument to make reasonable inferences from the evidence, including the credibility of witnesses. State v. Thorgerson, 172 Wn.2d at 448. So long as a prosecutor does not express a personal opinion or incite the passions of a jury, a prosecutor may comment on a witness' veracity. State v. Edvalds, 157 Wn. App. 517, 525, 237 P.3d 368 (2010).

The prosecutor's statements did not express a personal opinion or incite the passions of the jury with his statements. He asked the jury to consider her testimony on the stand and how that supported her credibility. The prosecutor made a reasonable inference based on C.C.'s testimony regarding her credibility. Regardless, Hanson did not object to the statement and, even if it was improper, it was not so flagrant and ill-intentioned that the prejudice could not have been remedied by an instruction to the jury.

*C. Going to Prison Statement*

Pretrial, Hanson objected to the admission of the 911 recording where the detective repeated what she heard Hanson say to C.C. The trial court admitted portions of the call over Hanson's objection that they were hearsay.[10] Hanson does not challenge that ruling, but, instead, raises for the first time on appeal that the prosecutor improperly put forth before the jury the issue of sentencing during

---

[10] The court made a detailed pretrial ruling excluding and admitting statements contained in the call. The court determined the statement at issue was a present sense impression and not hearsay because it was a statement by a party opponent.

closing argument.[11] Ironically, during motions in limine, the court granted the State's motion to exclude discussion of potential penalties. This is a standard motion to prevent defense from introducing potential penalties as an attempt to garner sympathy from the jury to the benefit of the defendant.

During closing, the prosecutor told the jury:

> And lastly tampering with the witness looks like the defendant screaming at [C.C.] outside of her apartment. He knows what he did to her. And he's desperate. He continues to pressure [C.C.] to sign a document saying that he didn't rape her.

> [The detective] listens in on the conversation as it happens. [The detective] hears the defendant tell [C.C.] how he is going to go to fucking prison, and how she's the only one who can release him.

At the time the court made its ruling on the admissibility of the statement, it explained the State was not offering the statement for the truth of the matter asserted. However, no party requested this specific limiting instruction at the time the statements were admitted during trial.

As a general rule, "[t]he question of the sentence to be imposed by the court is never a proper issue for the jury's deliberation, except in capital cases." State v. Bowman, 57 Wn.2d 266, 271, 356 P.2d 999 (1960); see State v. Todd, 78 Wn.2d 362, 375, 474 P.2d 542 (1970) ("Punishment is a question of legislative policy; the jury's function is to find the facts.").

---

[11] Hanson also argues on appeal that the 911 recording should not have been admitted because it was impossible for the detective to have heard what he said. This statement is nothing more than a conclusory argument and insufficient to warrant review. Hanson also contends the admitted recording was incomplete and that the excluded portion of the recording should have been admitted. This statement also is not sufficient to allow for review. RAP 10.10(c).

Hanson relies on cases where the prosecutor directly discusses the issue of sentencing in voir dire or closing argument. State v. Townsend, 142 Wn.2d 838, 846, 15 P.3d 145 (2001) (holding that a jury in a noncapital case may not be informed about the penalty for the charged crime), overruled on other grounds by State v. Pierce, 195 Wn.2d 230, 455 P.3d 647 (2020). State v. Murphy, 86 Wn. App. 667, 670, 937 P.2d 1173 (1997) (deciding the trial court erred in informing the jury during voir dire that the death penalty was not involved in the case); Shannon v. United States, 512 U.S. 573, 114 S. Ct. 2419, 129 L. Ed. 2d 459 (1994) (concluding the Insanity Defense Reform Act does not require a jury instruction regarding consequences of a verdict of not guilty by reason of insanity). That is not what the prosecutor did in the instant case.

The prosecutor was discussing evidence that supported the charge of tampering with a witness. Hanson's statement was made in the course of attempting to influence C.C. The prosecutor did not discuss what potential penalty Hanson could face if he were found guilty.

Prior to the prosecutor's closing argument, the court correctly instructed the jury stating, "You must disregard any remark, statement, or argument that is not supported by the evidence or the law in my instructions." The court also instructed the jury stating, "You have nothing whatsoever to do with any punishment that may be imposed in case of a violation of the law. You may not consider the fact that punishment may follow conviction except insofar as it may tend to make you careful."

Hanson fails to demonstrate how the prosecutor's conduct was both improper and prejudicial.

## CONCLUSION

We conclude that (1) Hanson waived his charging claim, (2) his counsel was not ineffective, (3) the prosecutor did not commit misconduct and, if there were any improper statements, they were not so flagrant and ill-intentioned that they could not be cured with a jury instruction, and (4) sufficient evidence supports the two convictions Hanson challenged, vehicular assault and felony hit and run.

It follows that Hanson's claim of cumulative error also fails. "The accumulation of errors may deny the defendant a fair trial and therefore warrant reversal even where each error standing alone would not." State v. Davis, 175 Wn.2d 287, 345, 290 P.3d 43 (2012). A defendant has the right to a fair trial, not a perfect one. In re Pers. Restraint of Elmore, 162 Wn.2d 236, 267, 172 P.3d 335 (2007). Hanson did not demonstrate the existence of cumulative errors. A new trial is not warranted.

We affirm Hanson's convictions and deny his petition.

_Coburn, J._

WE CONCUR:

_Mann, C.J._

_Dwyer, J._

42